UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

ROBERTO SANTOS,

        Plaintiff,

   v.

DAVID L. BUSH, et al.,

        Defendants.

---

Civil No. 09-2018 (NLH/KMW)

**OPINION**

**APPEARANCES:**

Roberto Santos
269865/929753B
Bayside State Prison
4293 Route 47
P.O. Box F-1
Leesburg, New Jersey 08327
    *Pro Se*

Christopher C. Josephson, Esquire
Office of the New Jersey Attorney General
Robert J. Hughes Justice Complex
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625-0112
    *Attorney for Defendants David L. Bush and Karen Balicki*

**HILLMAN, District Judge**

    This matter comes before the Court by way of Defendants David L. Bush and Karen Balicki's motion [Doc. No. 54] seeking summary judgment and the dismissal of Plaintiff's complaint with prejudice.  The Court has considered the parties submissions, and decides this matter pursuant to Federal Rule of Civil Procedure

78.

For the reasons expressed below, Defendants' motion for summary judgment is granted.

## I.   <u>JURISDICTION</u>

In the complaint, Plaintiff alleges violations of his Constitutional Due Process rights, and brings this action pursuant to 42 U.S.C. § 1983.  Accordingly, the Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

## II.   <u>BACKGROUND</u>

### A.   Allegations in Plaintiff's Complaint

Plaintiff, currently an inmate at Bayside State Prison, submitted the complaint in this action on April 29, 2009, generally alleging that Defendants David L. Bush and Karen Balicki forcibly medicated Plaintiff without Due Process during the time Plaintiff was incarcerated at South Woods State Prison ("SWSP").  (<u>See generally</u> Compl. [Doc. No. 1] 5-8.)  In the complaint, Plaintiff alleges that Defendant Bush, a doctor at SWSP, "is the person, who is forcing me to take Risperdal."  (<u>Id.</u> at 5.)  Plaintiff also asserts that Defendant Balicki is the Warden at SWSP, and "approved all treatment that was forced on" Plaintiff.  (<u>Id.</u> at 6.)  Plaintiff represents that he requested that Defendant Bush and the New Jersey Department of Corrections

2

("DOC") stop giving him this medication, but his requests were refused.  (Id.)  Accordingly, Plaintiff seeks to prevent officials at SWSP[1] from giving him "forced medication, without Due Process of Law[.]"  (Id. at 8.)

**B.  Plaintiff's Incarceration & Initial Treatment History[2]**

Plaintiff was originally convicted of murder and sentenced to a term of imprisonment of thirty years to life in 1995. (Statement of Material Facts Pursuant to Local Civil Rule 56.1 [Doc. No. 54-3] (hereinafter, "St. of Mat. Facts"), ¶ 2.) Throughout the term of Plaintiff's incarceration with the New Jersey DOC, Plaintiff has been incarcerated at several different correctional facilities, including East Jersey State Prison ("EJSP"), Northern State Prison ("NSP"), SWSP, and most recently, Bayside State Prison. (See St. of Mat. Facts ¶¶ 3, 9; see also Compl. at 5).

In this action, Plaintiff's claims specifically center on the involuntary administration of medication to Plaintiff while he was incarcerated at SWSP.  However, it appears that

---

1.  While Plaintiff seeks injunctive relief against officials at SWSP, the Court notes that Plaintiff is now incarcerated at Bayside State Prison in Leesburg, New Jersey.

2.  The facts of Plaintiff's incarceration and treatment history with the DOC are taken from Defendants' Statement of Material Facts, as well as from the Declaration of Kippie Pelzer and its attached exhibits, some of which were filed under seal.  (See generally Statement of Material Facts Pursuant to Local Civil Rule 56.1 [Doc. No. 54-3] ¶¶ 1-29; Decl. of Kippie Pelzer [Doc. No. 54-2] ¶¶ 1-9.)

Plaintiff's claims of forced medication at SWSP stem from mental health treatment by the DOC which commenced in late 2007 in response to events that occurred while Plaintiff was incarcerated at EJSP.[3]  (See generally St. of Mat. Facts ¶¶ 3-14.)  As a result, a detailed factual background of Plaintiff's treatment history is necessary to analyze Plaintiff's claims.

While incarcerated at EJSP on December 21, 2007, Plaintiff expressed concerns during a nurse sick call that he was being targeted by DOC staff members with regard to a DOC internal investigation.  (Id. ¶ 3.)  Plaintiff was then placed on constant observation, i.e., suicide watch, and a follow-up evaluation with either a psychologist or psychiatrist was ordered for later that day.  (Ex. C to the Decl. of Kippie Pelzer, DOC[4] 267-68.)  The follow-up evaluation of Plaintiff occurred on the same day, at which time psychologist Kristi Corcoran concluded that Plaintiff

---

3.  Plaintiff describes the incidents which occurred at EJSP in late December 2007 in his complaint, apparently in an attempt to demonstrate why he does not need to be medicated with Risperdal. (Compl. at 7.)  Plaintiff also alleges that upon being transferred to NSP he was immediately forced to take medication without Due Process and that this denial of Due Process continued when Plaintiff arrived at SWSP.  (Id. at 7-8.)  Despite Plaintiff's explanation of incidents at other prisons and with other DOC officials regarding his mental health status and forced medication, Plaintiff named only Defendants Bush and Balicki as Defendants in this action.  Therefore the Court's analysis is limited to these Defendants and the claims regarding Plaintiff's involuntary medication while at SWSP.

4.  For the sake of clarity, the Court cites the page numbers of the relevant exhibits by reference to the "DOC" bates number contained on each page.

did not exhibit signs or symptoms of any acute mental illness and determined there was no need for continued observation of Plaintiff.  (Id. at DOC 269.)  Ms. Corcoran further noted that Plaintiff should be seen every seven to ten days by a mental health social worker during the course of his stay in detention. (Id.)

However, approximately five days later on December 26, 2007, Plaintiff's mental health status began to change.  At that time, a registered nurse at EJSP first observed Plaintiff laying under his bunk with his sheets and bedding on top of him.  (Id. at DOC 271.)  A corrections officer then informed the nurse that Plaintiff had not eaten for three days and would only drink water.  (Id.)  As a result of her observations and the information that Plaintiff was not eating, the nurse notified the mental health staff at EJSP.  (Id.)  Subsequently, Laura Pires, a Mental Health Counselor, evaluated Plaintiff and conducted a suicide risk assessment on December 27, 2007.  (Id. at DOC 273-276; St. of Mat. Facts ¶ 6.)  Based on her evaluation and assessment, Ms. Pires noted that Plaintiff's condition indicated depressive turmoil and a moderate risk for suicide.  (Ex. C to the Decl. of Kippie Pelzer, DOC 274-75.)

Upon her initial visit to Plaintiff's cell, Ms. Pires observed Plaintiff wearing a styrofoam cup against his forehead, which Plaintiff indicated helped somewhat to protect him from the

5

laser beams coming into his cell and burning his head.  (Id. at
275; St. of Mat. Facts ¶ 7.)  Ms. Pires further learned from
Plaintiff, DOC staff, and medical personnel, that Plaintiff had
been refusing all food since December 21, 2007.  (Ex. C to the
Decl. of Kippie Pelzer, DOC 275; St. of Mat. Facts ¶ 6.)
Plaintiff then admitted to Ms. Pires that he was refusing food
and only drinking water from the sink because Plaintiff believed
his food was being poisoned as Plaintiff could allegedly smell
cyanide in the food.  (Ex. C to the Decl. of Kippie Pelzer, DOC
275; St. of Mat. Facts ¶ 7.)  Plaintiff also complained that he
had not been able to sleep for approximately four (4) days.  (Ex.
C to the Decl. of Kippie Pelzer, DOC 275; St. of Mat. Facts ¶ 7.)

     Although Plaintiff had no prior mental health history, no
history of previous suicide attempts, no prior treatment with
medication, and acknowledged feeling "okay" on December 21, 2007,
Ms. Pires concluded that Plaintiff was "extremely paranoid" as
evidenced by Plaintiff's assertions that: (1) "'undercover cops
[were] coming to his cell with weapons to try to kill him[;]'"
and (2) the federal government sought Plaintiff's cooperation
with several investigations and would pardon Plaintiff if he
cooperated.  (Ex. C to the Decl. of Kippie Pelzer, DOC 275; St.
of Mat. Facts ¶ 7.)  Ms. Pires noted that the reasons for
Plaintiff's "psychiatric decompensation remain[ed] unclear" but
ordered further follow-up and evaluation by the Mental Health

6

Department, including having Plaintiff meet with a psychiatrist to "determine the need for medication." (Ex. C to the Decl. of Kippie Pelzer, DOC 275.)

Several hours later, a nurse at EJSP made a note in Plaintiff's chart for "strange behavior" because Plaintiff was sitting on his bed with a "brown paper bag over his head." (Ex. C to the Decl. of Kippie Pelzer, DOC 276.) By late afternoon on December 27, 2007, arrangements were made to transfer Plaintiff to NSP for continuing mental health treatment. (Ex. C to the Decl. of Kippie Pelzer, DOC 276-78.) In preparing for the transfer, Dr. Biman B. Roy of EJSP evaluated Plaintiff and again noted Plaintiff's fear of laser beams burning a hole in his brain and his belief that his food was being tampered with. (Ex. C to the Decl. of Kippie Pelzer, DOC 277.) Plaintiff also indicated to Dr. Roy that Plaintiff was "'picking up voices from the air, not directed at [Plaintiff] but somehow related to [Plaintiff]." (Id.)

During the evaluation, Dr. Roy further noted that Plaintiff refused to take any of the prescribed medication voluntarily, including Risperdal and Cogentin, for fear of being poisoned. (Id. at DOC 276, 278.) While Plaintiff did not express that he was going to hurt himself or others, Dr. Roy found that Plaintiff "remain[ed] grossly psychotic and paranoid" and that Plaintiff's "insight and judgment" were "impaired." (Id. at DOC 276.) In

7

light of Plaintiff's psychotic state, Dr. Roy concluded that
Plaintiff could pose a danger to himself based on his continuing
refusal to eat and his impulsivity.  (Id. at DOC 278.)

By early evening on December 27, 2007, Plaintiff was
transferred to the Stabilization Unit at NSP.  (Id. at DOC 279.)
At that time, Plaintiff underwent a Nurse Transfer Admission
Assessment and his non-compliance with the Medication
Administration Record ("MAR") was documented by a staff nurse at
NSP.  (Id. at DOC 279-80.)  Specifically, Plaintiff refused
treatment with psychotropic medication stating, "'I don't want
it, I don't take meds.'"  (Id. at DOC 280; St. of Mat. Facts ¶
8.)  The staff nurse counseled Plaintiff regarding the use of
medication but was unsuccessful in her attempts to get Plaintiff
to take the medication voluntarily.  (Ex. C to the Decl. of
Kippie Pelzer, DOC 280.)

During a subsequent Mental Health Nurse Intake Assessment,
Plaintiff "appeared confused" and made another report of seeing
laser beams coming down from some unknown origin and of hearing
voices.  (Id. at DOC 282.)  However, Plaintiff later claimed that
he did not recall saying that he was the target of an internal
investigation at EJSP and attempted to explain away his reports
of laser beam reports by stating that it was too hot in his cell
and he wasn't eating.  (Id.)  Plaintiff further explained that he
wasn't eating because he was not hungry and had no appetite, as

opposed to believing his food was being poisoned.  (Id.)
Plaintiff again refused any medication, asserting that he was in
good health and did not take medication.  (Id.)  Based on this
assessment, the nurse diagnosed Plaintiff as suffering from
"impaired thought".  (Id.)  The medical staff at the NSP
Stabilization Unit subsequently ordered that Plaintiff "be placed
on constant watch with only [a] suicide blanket and finger
foods."  (Id.)

On the following day, December 28, 2007, Dr. Alan Kaye, a
psychiatrist at NSP, conducted a psychiatric evaluation of
Plaintiff.  (Id. at DOC 287; St. of Mat. Facts ¶ 10.)  In the
chart notes of this evaluation, Dr. Kaye acknowledged Plaintiff's
involvement in a "high profile" case related to the Mob.  (Ex. C
to the Decl. of Kippie Pelzer, DOC 288.)  With regard to this
case, Plaintiff informed Dr. Kaye that all the incidents involved
in the case were being recorded and Plaintiff was aware of this
fact because he was "a 'special man of God'."  (Id.; St. of Mat.
Facts ¶ 11.)

Plaintiff also indicated to Dr. Kaye that he should no
longer be in prison because the Governor gave him "a commutation
and full pardon[,]" and the President gave him "two consecutive
pardons."  (Ex. C to the Decl. of Kippie Pelzer, DOC 288; St. of
Mat. Facts ¶ 11.)  Plaintiff reaffirmed his previous belief that

his food was being poisoned with cyanide while at EJSP.[5]  (Ex. C to the Decl. of Kippie Pelzer, DOC 288; St. of Mat. Facts ¶ 11.) Finally, Plaintiff again refused medication, telling Dr. Kaye that he "want[ed] no part of any medication [because] ... he does not need it[,]" and that he could be poisoned through any injected medications.  (Ex. C to the Decl. of Kippie Pelzer, DOC 288; St. of Mat. Facts ¶ 11.)

Based on this evaluation, Dr. Kaye concluded that Plaintiff was "delusional" with impaired insight and judgment, and formed the "impression" that Plaintiff was psychotic.  (Ex. C to the Decl. of Kippie Pelzer, DOC 288; St. of Mat. Facts ¶ 12.) Accordingly, Dr. Kaye ordered that Plaintiff remain on constant watch.  (Ex. C to the Decl. of Kippie Pelzer, DOC 288.)  Dr. Kaye determined that based on Plaintiff's psychotic state and his refusal to take medication, the potential existed for Plaintiff's paranoia to escalate causing Plaintiff to become a danger to himself.  (Id.)  As a result, Dr. Kaye concluded that "Forced Medication may be needed."  (Id.)

A Mental Health Treatment Plan for Plaintiff was established on December 28, 2007, shortly after Dr. Kaye's evaluation.  (Ex. D to the Decl. of Kippie Pelzer, DOC 291.)  Plaintiff was prescribed Risperdal and Cogentin, and the Treatment Plan set

---

5.  Dr. Kaye noted that Plaintiff was eating while in the Stabilization Unit at NSP.  (Ex. C to the Decl. of Kippie Pelzer, DOC 288.)

forth the following treatment goals for a ten day time frame, Plaintiff was to: (1) "demonstrate a willingness to take medications"; (2) "be removed from constant to close watch"; (3) "demonstrate a decrease[] in psychotic symptoms as evidenced by eating his food daily and taking medication"; and (4) "demonstrate trust by following [the] treatment outlined."  (Id.) Plaintiff's Treatment Plan further required a psychiatrist to meet with Plaintiff on a daily basis to diagnosis Plaintiff's condition, prescribe medication, and monitor the effectiveness of the medications.  (Id.)  The Treatment Plan also provided that Plaintiff would meet with a psychologist daily for psychological evaluations and counseling, with a social worker daily for case management services, and with a nurse daily to administer medication and report Plaintiff's compliance with the MAR.[6]  (Id. at DOC 292.)

Dr. Kaye interviewed Plaintiff again on December 29, 2007 and noted that Plaintiff was slightly disoriented and remained psychotic.  (Ex. C to the Decl. of Kippie Pelzer, DOC 297.)  Dr. Kaye further observed that Plaintiff was "delusionally paranoid" because Plaintiff: (1) washed off his food before eating; and (2) believed that any injection by NSP staff was for the purpose of trying to kill Plaintiff.  (Id.)  Despite Plaintiff's objection

---

6.  According to the record, Plaintiff refused to sign his initial Treatment Plan.  (Ex. D to the Decl. of Kippie Pelzer, DOC 293.)

that he did not need medication, Plaintiff was medication compliant on December 29, 2007.  (Id.)  However, on the afternoon of December 30, 2007, Plaintiff again refused medication and counseling by a nurse at NSP was not effective.  (Id. at DOC. 300.)  Several hours later, Plaintiff voluntarily ingested his medication on a subsequent attempt by NPS staff, but only after the nurse permitted Plaintiff to open the medicine package himself.  (Id. at DOC 303.)  The following morning, on December 31, 2007, Plaintiff again refused medication, was non-compliant with the MAR, and was not receptive to counseling from an NSP nurse.  (Id. at DOC 304-05.)

As a result of Plaintiff's inconsistency in remaining medication complaint per his Treatment Plan, on December 31, 2007, Dr. Meroujan Maljian prepared a Psychiatric Progress Note indicating that Plaintiff repeatedly refused Risperdal, denied hearing voices, denied feeling depressed, and denied ever saying his food was being poisoned -- explaining that any staff member who wrote that about Plaintiff was lying in order to get Plaintiff to take forced medication.  (Id. at DOC 305.)  Dr. Maljian then diagnosed Plaintiff with "Psychotic Disorder NOS".[7] (Id. at DOC 306; St. of Mat. Fact ¶ 14.)  Based on Plaintiff's numerous refusals to take Risperdal voluntarily, Dr. Maljian prepared a petition for forced medication.  (Ex. C to the Decl.

---

7.  "NOS" meaning "Not Otherwise Specified".

of Kippie Pelzer, DOC 306.)

    **C.   Non-Emergency Involuntary Medication Administration to Plaintiff**

    After evaluating Plaintiff and preparing a Psychiatric Progress Note, on December 31, 2007, Dr. Maljian prepared and submitted a MR-051 Involuntary Medication Report ("IMR") pursuant to New Jersey Administrative Code § 10A:16-11.1[8] and the DOC's

---

8.  Section 10A:16-11.1 provides:

    (a) Pursuant to <u>Washington, et al. v. Harper</u>, 494 U.S. 210, 110 S. Ct. 1028 (1990), clinically indicated psychotropic medications which have been prescribed for the inmate by a psychiatrist as part of an individualized treatment plan may be administered by the responsible health care provider to any seriously mentally ill inmate against the will of the inmate and consistent with the medical interests of the inmate.

    (b) Administration of clinically indicated involuntary psychotropic medications is in an inmate's medical interest where one or more of the following concerns exists:

        1. There is substantial likelihood of serious physical harm to the inmate or to others;
        2. There is a substantial likelihood of significant property damage;
        3. The inmate is unable to care for himself or herself so that the inmate's health or safety is endangered; and/or
        4. The inmate is incapable of participating in any treatment plan which would offer the inmate a realistic opportunity to improve his or her condition.

    (c) Prior to the administration of clinically indicated involuntary psychotropic medications to an inmate, the responsible health authority or designee shall consult with the correctional facility Administrator or designee. The Administrator or designee shall immediately notify the custody staff supervisor of the

Mental Health Services Internal Management Procedure for Non-Emergency Involuntary Medication Administration (hereinafter, "the IMA Procedure"). (St. of Mat. Facts ¶ 14; Ex. B to Decl. of Kippie Pelzer, DOC 64- 75; Ex. D. to Decl. of Kippie Pelzer, DOC 309-310.)

The December 31, 2007 IMR prepared by Dr. Maljian indicated that Plaintiff continued to refuse his prescribed medication despite multiple attempts to counsel Plaintiff on the nature of his illness, including paranoia and delusions, and how medication helps lessen such symptoms. (Ex. D. to Decl. of Kippie Pelzer, DOC 309.) Dr. Maljian further concluded that involuntary administration of medication would benefit Plaintiff by "[l]essening [his] delusional beliefs regarding [his] food being poisoned, [and] improv[ing] [his] appetite". (Id.) The December 31, 2007 IMR also outlined Dr. Maljian's belief that if Plaintiff remained medication non-complaint, then Plaintiff would "become more delusional, thinking his food is being poisoned, and may stop eating again, risking dehydration and starvation[,]" and

_____

intended administration of involuntary psychotropic medications to an inmate.

(d) When the custody staff supervisor reasonably believes the use of force is necessary in order to ensure that the responsible health care provider can administer the clinically indicated involuntary psychotropic medications, the use of force shall be authorized and the custody staff shall use only that force that is objectively reasonable in accordance with N.J.A.C. 10A:3-3.2.

that the possible gains from involuntary medication outweighed any possible side effects.  (Id.)  Accordingly, Dr. Maljian recommended involuntary administration of Haldol and Cogentin by injection whenever oral Risperdal was refused.  (Id.)

In response to the December 31, 2007 IMR by Dr. Maljian, a Treatment Review Committee ("TRC") conducted a hearing on January 3, 2008 to determine whether Plaintiff should be involuntarily medicated.[9]  (St. of Mat. Fact ¶ 15; Ex. D to Decl. of Kippie Pelzer, DOC 79.)  The TRC reviewed Plaintiff's Inmate Face Sheet, Progress Notes, the December 31, 2007 IMR, Plaintiff's Mental Health Treatment Plan, Plaintiff's Psychiatric Evaluation, Plaintiff's Electronic Medical Records, and Plaintiff's MAR. (St. of Mat. Fact ¶ 16; Ex. D to Decl. of Kippie Pelzer, DOC 79-80.)  At the January 3, 2008 hearing,[10] the TRC concluded that Plaintiff should be involuntarily medicated because he "presented a substantial risk of imminent harm to himself, ... would be unable to care for himself and would be incapable of participating in his treatment plan without medication."  (St. of Mat. Fact ¶ 16; Ex. D to Decl. of Kippie Pelzer, DOC 79-82.)

---

9.  The record demonstrates that Plaintiff was provided with written notice of this hearing pursuant to the IMA Procedure. (See Notice of Hearing, Ex. D. to Decl. of Kippie Pelzer, DOC 76-78.)

10.  It appears that despite receiving notice of the hearing and initially indicating he would attend, on the day of the hearing Plaintiff refused to attend.  (TRC Report, Ex. D to Decl. of Kippie Pelzer, DOC 80-81.)

Accordingly, the TRC voted in favor of Dr. Maljian's recommendation to involuntarily medicate Plaintiff. (TRC Report, Ex. D to Decl. of Kippie Pelzer, DOC 83.) Plaintiff began a Forced Medication Protocol ("FMP") on January 5, 2008, and after one injection of medication, Plaintiff began to voluntarily comply with the MAR. (Ex. E to Decl. of Kippie Pelzer, DOC 86.) Thereafter, Plaintiff was referred to SWSP on approximately January 7, 2008. (Id.)

After arriving at SWSP, Plaintiff, on January 11, 2008, expressed to Dr. Anthony Tamburello his "fixed beliefs" that:

> he [was] a "Federal Marshal," that a microchip was implanted in his head that records the activities of others, that images and sounds are transmitted to the FBI and the media, that said chip was used in the corruption investigation at EJSP, that officers involved in the corruption wish to retaliate against him because of it, that he is being psychiatrically medicated to cover it up, and that he is able to predict the future.

(Ex. E to Decl. of Kippie Pelzer, DOC 86). Plaintiff also indicated to Dr. Tamburello that he was "highly opposed to taking medication" and "admitted that he has been 'cheeking' the Risperdal" despite being on a Forced Medication Protocol. (Id.)

Based on the facts gleaned from his evaluation of Plaintiff, Dr. Tamburello prepared and submitted a second IMR for Plaintiff on January 11, 2008, which was within the initial thirty-day effective period of the TRC's original Report authorizing involuntary medication. (Ex. E to Decl. of Kippie Pelzer, DOC

16

86-87.)  Dr. Tamburello noted that Plaintiff was suffering from a Psychotic Disorder, that Plaintiff had "[e]xtremely poor insight[, and was] completely unaware of his bizarre thought processes/content[.]"  (Id. at DOC 86.)  Dr. Tamburello indicated in the January 11, 2008 IMR that Plaintiff was again refusing to accept the prescribed Risperdal despite efforts by the nursing and psychiatry staff to convince him that it was necessary.  (Id. at DOC 87.)  Dr. Tamburello noted that if Plaintiff remained medication non-complaint, Plaintiff would become increasingly delusional, with the potential to become agitated and violent given his history of extreme violence (including, murder, institutional fighting, and disruptive conduct).  (Id.) Accordingly, Dr. Tamburello believed that the possible gains from involuntary medication again outweighed any possible side effects and thus recommended and requested a one-hundred-eighty day extension of Plaintiff's FMP with injections of Haloperidol and possible consideration of Risperdal Consta.  (Id.)

A second TRC was convened which conducted another hearing regarding Plaintiff's FMP on January 22, 2008 in accordance with the IMA Procedure.[11]  (TRC Report, Ex. E to Decl. of Kippie Pelzer, DOC 98-102.)  Plaintiff was present at the hearing when

---

11.  The record demonstrates that Plaintiff was provided with written notice of this hearing pursuant to the IMA Procedure on January 18, 2008.  (See Notice of Hearing, Ex. E to Decl. of Kippie Pelzer, DOC 88-89.)

the TRC again determined that Plaintiff should be involuntarily medicated and voted to extend the FMP for an additional one hundred eighty days.  (Id.)  The TRC Report indicates that Plaintiff chose not to appeal the TRC's decision.[12]  When Plaintiff continued to refuse medication during the extended time period for the FMP, a third IMR was prepared and submitted by Defendant Bush[13] on July 3, 2008.  (Ex. F to Decl. of Kippie Pelzer, DOC 108.)  The July 3, 2008 IMR was prepared and submitted prior to the expiration of the one hundred eighty day extension of the FMP.

In the July 3, 2008 IMR, Defendant Bush diagnosed Plaintiff with paranoid schizophrenia based on Plaintiff's six-month history of psychosis which included "delusions of being poisoned, being pardoned by [the] president, believing [Plaintiff] heard [a] police radio talking about him[,]" as well as Plaintiff's denial of past problems and insistence that he could handle these issues on his own.  (Id.; St. of Mat. Facts ¶¶ 20-22.)  Defendant Bush also indicated in the July 3, 2008 IMR that Plaintiff was

_____

12.  A handwritten note on page five of the January 22, 2008 TRC Report states: "No appeal per inmate – he will follow what [the] committee states."  (TRC Report, Ex. E to the Decl. of Kippie Pelzer, DOC 102.)

13.  Although Defendant Bush signed and prepared the July 3, 2008 IMR on that date, Dr. Allan Martin also signed off on the July 3, 2008 IMR on July 7, 2008.  (Ex. F to Decl. of Kippie Pelzer, DOC 108.)  Dr. Martin was not named as a Defendant in this action.

continuing to refuse medication despite the SWSP staff
repeatedly: (1) educating Plaintiff on his illness and the need
for medication; (2) presenting Plaintiff with multiple treatment
options; (3) offering Plaintiff assistance with problem solving;
and (4) providing Plaintiff with the opportunity to consult other
medical professionals for a second opinion. (Ex. F to Decl. of
Kippie Pelzer, DOC 108; St. of Mat. Facts ¶ 21.) Accordingly, as
required by the IMA Procedure, Defendant Bush outlined his belief
that the possible gains[14] from involuntary medication outweighed
any possible side effects. (Ex. F to Decl. of Kippie Pelzer, DOC
108; St. of Mat. Facts ¶ 22.) Therefore, Defendant Bush
recommended the involuntary administration of Risperdal Consta
every fourteen days.[15] (Ex. F to Decl. of Kippie Pelzer, DOC
108.)

       In response to the July 3, 2008 IMR, a third TRC was

---

14. Specifically, Dr. Bush explained that involuntary medication
would prevent the recurrence of "active psychosis" in Plaintiff
wherein Plaintiff: fears eating and believes his food is
poisoned; has paranoid beliefs about people plotting to kill
Plaintiff; and could potentially hurt himself or others in an
attempt to defend himself. (Ex. F to Decl. of Kippie Pelzer, DOC
108.)

15. By way of background, it appears that Risperdal Consta "is a
long-acting injectable form of a class of newer medicines known
as atypical antipsychotics" which is "given once every 2 weeks"
and "can help manage the symptoms that are part of Bipolar I
Disorder and schizophrenia." Janssen Pharmaceuticals, Inc. ––
Risperdal Consta,
http://www.risperdalconsta.com/about-risperdal-consta (last
visited April 13, 2012).

convened and a third TRC hearing[16] was held on July 25, 2008 regarding continuing Plaintiff's involuntary medication.  (Ex. F to Decl. of Kippie Pelzer, DOC 107, 109, 118; St. of Mat. Facts ¶ 23.)  Plaintiff was present at the July 25, 2008 hearing where the TRC found that Plaintiff still presented a substantial risk of imminent harm to himself, that Plaintiff was unable to care for himself, and that Plaintiff was incapable of participating in his treatment plan without medication.  (TRC Report, Ex. F to Decl. of Kippie Pelzer, DOC 118-122; St. of Mat. Facts ¶ 23.)  Based on these findings, the TRC again voted in favor of extending Plaintiff's FMP.[17]  (Id.)

When Plaintiff's refusal to take medication persisted in the months following the July 25, 2008 TRC hearing, a fourth IMR regarding Plaintiff's condition was prepared and submitted by Defendant Bush on February 9, 2009.  (Ex. G to Decl. of Kippie Pelzer, DOC 129.)  As with the three prior IMR's prepared regarding Plaintiff's mental health status, the February 9, 2009 IMR indicated that Plaintiff was a paranoid schizophrenic, who

_____

16.  The record demonstrates that Plaintiff was provided with written notice of the July 25, 2008 hearing pursuant to the IMA Procedure on July 23, 2008.  (See Notice of Hearing, Ex. F to Decl. of Kippie Pelzer, DOC 109-111.)

17.  It appears that Plaintiff chose not to appeal the TRC's July 25, 2008 determination as the TRC Report notes that after being informed of the TRC's extension of the FMP, Plaintiff "appeared okay with the decision."  (TRC Report, Ex. F to Decl. of Kippie Pelzer, DOC 121.)

continued to refuse medication, denied past problems like refusing to eat and believing the president had pardoned him, and insisted there was no illness and thus no need for treatment. (Ex. G to Decl. of Kippie Pelzer, DOC 129; St. of Mat. Facts ¶¶ 24-25, 27.)  Defendant Bush also reaffirmed his belief that the gains of involuntarily administering medication outweighed any potential side effects and again recommended a FMP of Risperdal Consta every two weeks since Plaintiff, without medication, still presented a risk of harm to himself or others.  (Ex. G to Decl. of Kippie Pelzer, DOC 129; St. of Mat. Facts ¶¶ 24-27.)

As a result of the February 9, 2009 IMR, a fourth TRC was convened and conducted a fourth TRC hearing[18] on February 17, 2009.  (Ex. G to Decl. of Kippie Pelzer, DOC 130, 139; St. of Mat. Facts ¶ 28.)  Similarly to the prior three TRC hearings, Plaintiff was present at the February 17, 2009 wherein the TRC determined that without medication, "continued decompensation" of Plaintiff's mental health was likely thus demonstrating a substantial likelihood that Plaintiff would not be able to care for himself (thus endangering his safety), or to participate in any treatment plan designed to improve his condition.  (TRC Report, Ex. G to Decl. of Kippie Pelzer, DOC 142.)  Therefore,

---

18. The record demonstrates that Plaintiff was provided with written notice of the February 17, 2009 hearing pursuant to the IMA Procedure on February 13, 2009.  (See Notice of Hearing, Ex. G to Decl. of Kippie Pelzer, DOC 130-32.)

the TRC again voted to continue Plaintiff's FMP, and the TRC
Report reflects that Plaintiff chose not to appeal this
decision.[19]   (Id. at DOC 143.)

Approximately three months later, Plaintiff filed the
complaint in this action.


III. **DISCUSSION**

Defendants Bush and Balicki now move for summary judgment
pursuant to Federal Rule of Civil Procedure 56.  Summary judgment
is appropriate where the Court is satisfied that "'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'"  Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56).

An issue is "genuine" if it is supported by evidence such
that a reasonable jury could return a verdict in the nonmoving
party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A fact is "material" if, under the governing
substantive law, a dispute about the fact might affect the
outcome of the suit.  Id.  "In considering a motion for summary

_____

19.  A handwritten note at the bottom of page five of the TRC
Reports states that "IM Santos does not wish to appeal" the TRC's
decision.  (TRC Report, Ex. G to Decl. of Kippie Pelzer, DOC
143.)

judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving

23

party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## IV.  **ANALYSIS**

### A.  **Defendant Balicki's Liability Under Section 1983**

In the present motion, Defendant Balicki argues that she is entitled to summary judgment on Plaintiff's claims because they are based solely upon a theory of respondeat superior, and there is no evidence of any direct and intentional involvement by Defendant Balicki in any of the decisions to involuntarily administer psychotropic medication to Plaintiff.  (Br. in Supp. of Defs.' Balicki and Bush's Mot. for Summ. J. Pursuant to Fed. R. of Civ. P. 56 [Doc. No. 54-1] (hereinafter, "Defs.' Summ. J. Br."), 19.)  According to Defendant Balicki, the record demonstrates that she "did not participate in any of the ... hearings at which the TRC voted to involuntarily medicate" Plaintiff.  (Defs.' Summ. J. Br. 19.)  Defendant Balicki further argues that not only did Plaintiff fail to appeal any of the TRC

decisions, but even if he had, Defendant Balicki does not have any "involvement in deciding administrative appeals from TRC decisions." (Id. at 20 n.7.)

It is well settled that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). A plaintiff can demonstrate personal involvement "through allegations of personal direction or of actual knowledge and acquiescence." Id. However, "[a]llegations of participation or actual knowledge and acquiescence, ... must be made with appropriate particularity." Id. While Plaintiff names Balicki as a defendant in this action, Plaintiff makes only one conclusory allegation against her in the complaint, asserting only that Defendant Balicki "approved all treatment that was forced on [Plaintiff]." (Compl. at 6; see also id. at 8.)

To the extent Plaintiff also alleges that the DOC has refused Plaintiff's request to remove him from the FMP, that allegation lacks sufficient particularity regarding when the request was made, to whom it was made, which individuals or officials within the DOC denied that request, or whether Plaintiff was informed of the reasons for such denial. (See id.) Even construing Plaintiff's complaint liberally and assuming that Plaintiff's general allegation regarding the DOC is meant to

reference specific actions by Defendant Balicki, the record clearly reflects that Defendant Balicki was not involved in any of the mental health evaluations Plaintiff received or the development of Plaintiff's treatment plans.  It further reflects that Defendant Balicki had absolutely no direct involvement, or even actual knowledge of the specific circumstances surrounding the involuntary administration of medication to Plaintiff, the determinations made by the mental health staff at SWSP, or the proceedings before any of the four TRCs.

Therefore, it appears that Plaintiff seeks to impose liability against Defendant Balicki for the conduct of other DOC employees, including Defendant Bush, the mental health staff at SWSP, and members of the TRCs, based solely on Defendant Balicki's role as the Administrator of SWSP.  However, in order for liability to attach, Defendant Balicki must have had personal involvement in the acts complained of by Plaintiff.  See Rode, 845 F.2d at 1207.  In this particular case, Plaintiff's complaint fails to allege any specific conduct by Defendant Balicki sufficient to demonstrate that she had personal involvement in allegedly implementing the FMP on Plaintiff without due process. (See, e.g., Compl. 5-8.)  Furthermore, the complaint is devoid of specific factual allegations which could sufficiently demonstrate that Defendant Balicki either personally directed -- or had actual knowledge of and acquiesced in -- the involuntary

26

administration of psychotropic drugs to Plaintiff in violation of his due process rights.

In opposing the motion for summary judgment,[20] Plaintiff argues that Defendant Balicki violated Plaintiff's "constitutional rights when a treatment review committee at [SWSP], ordered involuntary medication with psychotropic drugs." (Pl.'s Opp'n [Doc. No. 56] 2.)  Plaintiff contends that Defendant Balicki was present "at an involuntary hearing and ... did make decisions over [P]laintiff." (Id. at 4.)  However, the record evidenced submitted by Defendants, which includes four TRC Reports, multiple psychiatric and psychological evaluations, and other mental health records, demonstrates that Defendant Balicki: (1) was not present at any of the four TRC hearings; and (2) was not a member of any of the four TRCs which made decisions regarding involuntarily medicating Plaintiff.

In an attempt to demonstrate Defendant Balicki's personal involvement and knowledge of Plaintiff's involuntary medication, Plaintiff points to a March 25, 2010 letter[21] Plaintiff sent to

---

20.  Although Plaintiff's opposition was untimely, the Court will consider the opposition in light of Plaintiff's pro se status, the absence of any objection by Defendants, and Plaintiff's representations that he encountered Mail Room delays at Bayside State Prison in attempting to mail his opposition brief to the Court.  (See Letter dated Oct. 17, 2011 [Doc. No. 55] 1.)

21.  In Plaintiff's opposition, Plaintiff references a "letter; Roberto Santos [sent] to Judge Williams dated 3.30.11". (Pl.'s Opp'n 4.)  However, the docket does not reflect that any letter was sent to Magistrate Judge Williams in March 2011.  It appears

the Magistrate Judge assigned to this case.   (Letter, March 25,
2010 [Doc. No. 24] 1-2.)   Attached to the March 25, 2010 letter
is a March 9, 2010 letter allegedly sent by Defendant Balicki to
Plaintiff's grandmother related to issues of Plaintiff's
unwillingness to take medication voluntarily.   (Id. at 2.)   In
the March 9, 2010 letter, Defendant Balicki states in pertinent
part:

> Your grandson has access to medical care here at
> the institution.  I am not a doctor and can
> neither prescribe medication nor order medication
> to be stopped.  If your grandson does not want to
> take the prescribed medication, he can refuse.
> It does not require a doctor's order or my
> direction; he has authority if he believes the
> medication is not good for him.  If he has
> concerns about any aspect of his medical care, I
> would urge him to discuss with appropriate
> medical staff.

(Id.)

    Despite Plaintiff's attempt to argue otherwise, the March 9,
2010 letter is also insufficient to demonstrate personal
involvement, or knowledge and acquiescence, by Defendant Balicki
in approving or otherwise deciding whether Plaintiff should have
been involuntarily medicated.   The March 9, 2010 letter only
establishes that Defendant Balicki had knowledge of the following

---

to the Court that Plaintiff was attempting to reference the March
25, 2010 letter, and therefore, the Court refers to this letter
in considering Plaintiff's argument.

facts: (1) Plaintiff was prescribed medication[22] at SWSP; (2) Plaintiff did not desire to take his prescribed medication; (3) Plaintiff was receiving medical treatment at SWSP; (4) Plaintiff was within his rights to refuse to take the prescribed medication and refusal did not require a doctor's order or authorization from Defendant Balicki; and (5) Plaintiff should consult with the medical staff, not Defendant Balicki, regarding any aspect of his medical care. (See id.) To the extent the March 9, 2010 letter establishes these specific facts, this letter was generated nearly a year after Plaintiff originally submitted his complaint, and falls short of demonstrating that Defendant Balicki either personally directed, or had actual knowledge of and acquiesced in, the involuntary administration of psychotropic medication to Plaintiff without due process. See Rode, 845 F.2d at 1207. Contrary to the allegations of the complaint that Defendant Balicki "approved all treatment forced" upon Plaintiff, the March 9, 2010 letter demonstrates that Defendant Balicki specifically recognized Plaintiff's right to refuse prescribed medication and advised that Plaintiff should consult with medical staff regarding his treatment plan.

Here, Defendant Balicki has satisfied her burden on summary judgment by demonstrating the absence of a genuine issue of

---

22. It is unclear from the letter whether Defendant Balicki knew the names or type of medications prescribed to Plaintiff.

material fact with regard to her involvement in the involuntary administration of medication to Plaintiff.  The detailed medical records submitted to the Court reflect the absence of any evidence in support of Plaintiff's claims against Defendant Balicki that she forced treatment upon Plaintiff, attended any TRC hearings, or was at all involved in the decision making process leading to Plaintiff's involuntary medication.  See, e.g., Singletary, 266 F.3d at 192 n.2.  In opposing summary judgment, Plaintiff fails to identify specific facts and affirmative evidence which contradict the record evidence presented by Defendant Balicki demonstrating her lack of involvement.  See Anderson, 477 U.S. at 256-57.  Plaintiff cannot rest upon mere allegations, general denials, or vague statements as set forth in the complaint or his opposition to maintain a claim against Defendant Balicki.  See Saldana, 260 F.3d at 232.  Accordingly, Defendant Balicki is entitled to summary judgment with regard to Plaintiff's claims against her.

### B.   Section 1983 Liability for Involuntary Administration of Medication without Due Process

Defendants Bush and Balicki also move for summary judgment with respect to Plaintiff's claim that he was involuntarily medicated with psychotropic drugs without due process of law on the grounds that involuntarily medicating Plaintiff was in Plaintiff's medical interest and Plaintiff received all process due to him.  (Defs.' Summ. J. Br. 11.)  Relying on the Supreme

Court's decision in <u>Washington v. Harper</u>, 494 U.S. 210 (1990),

Defendants assert that the DOC's IMA Procedure comports with both

substantive and procedural due process requirements.[23]   (<u>See</u>

---

23.  Defendants also argue in passing that "there is no evidence
that [D]efendant Bush, by recommending [Plaintiff's] involuntary
medication, acted with the deliberate indifference necessary for
finding a Fourteenth Amendment substantive due process
violation."  (Defs.' Summ. J. Br. 13.)  In support of this
argument, Defendants cite <u>Vitek v. Jones</u>, 445 U.S. 480, 493-94
(1980).  We do not read <u>Vitek</u> to hold that the standard for
analyzing a substantive due process claim in this context is the
same as the deliberate indifferent standard utilized under the
Eighth Amendment.  <u>See generally</u> <u>Vitek</u>, 445 U.S. at 482-497.
With respect to a claim that involuntary medication of an inmate
violates due process, the standards for reviewing both
substantive and procedural challenges were set forth by the
Supreme Court ten years later in <u>Washington v. Harper</u>, 494 U.S.
210 (1990), and accordingly the <u>Washington</u> standards govern the
determination in this case.
     Nor do we read Plaintiff's complaint to specifically allege
a claim for deliberate indifference to his medical needs under
the Eighth Amendment.  (<u>See generally</u> Pl.'s Compl.) It is only in
the final sentence of Plaintiff's opposition to the present
motion that Plaintiff makes a passing reference to the Eighth
Amendment.  This final sentence alleges that the "practice of
D.O.C. defendants and the Attorney general violates an imates
[sic] constitutional rights by subjecting one to cruel and
unusual punishment."  (Pl's Opp'n 5.) This solitary assertion,
made only in Plaintiff's opposition, is inadequate to support a
claim for deliberate indifference where Plaintiff fails to assert
sufficient facts in support of such a claim.  Accordingly, even
construing Plaintiff's complaint liberally, the Court will not
read Plaintiff's complaint to allege a claim for deliberate
indifference merely because Plaintiff made this passing reference
to "cruel and unusual punishment" in his opposition papers.
     Moreover, Plaintiff's use of the phrase "cruel and unusual
punishment" was not made in the context of his own claims in this
matter.  Plaintiff only made this reference because he cited to a
previous class action suit filed by a group of inmates with
mental health disorders confined in New Jersey state prisons
where the inmates alleged that the DOC "unlawfully denied [the
inmates] treatment and medication for their mental disorders."
<u>D.M. v. Terhune</u>, 67 F. Supp. 2d 401, 402 (D.N.J. 1999) (referred
to incorrectly in Plaintiff's opposition as <u>New Jersey State</u>

<u>generally</u> <u>id.</u> at 12-16.)

_____

<u>Prison v. Jack Ternune</u> [sic]).

     Plaintiff does not rely on <u>D.M.</u> to argue that involuntary medication is a per se violation of the Eighth Amendment right to be free from cruel and unusual punishment.  Rather, Plaintiff asserts that the court-approved settlement reached in <u>D.M.</u> resulted in the establishment of "mental health psychiatrist's [sic] and units to assist those to be voluntarily medicated, not to be treated against their will[,]" but that the DOC "took advantage of the settlement and now use the doctor's [sic] to their benefit by punishing inmates and sanctioning them with psychotropic medication if they refuse to cooperate in an investigation, or they dislike you for whatever reason."  (Pl's Opp'n 5.)  According to Plaintiff, the DOC uses the results of the settlement in <u>D.M.</u> "as an instrument to punish and sanction you, and if you refuse medication they get a special team and forcefully [sic] medicate you."  (<u>Id.</u>)  In other words, Plaintiff alleges that the <u>D.M.</u> litigation has resulted in a process that violates the Fourteenth Amendment.  The nature of the claims in <u>D.M.</u> are therefore distinguishable from Plaintiff's claims here. The deliberate indifference claim alleged in <u>D.M.</u> involved the DOC's purported failure to provide mentally ill patients with treatment and medication, rather than the DOC's forcible medication of these inmates.  67 F. Supp. 2d at 402.  The district court in <u>D.M.</u> only addressed the issue of forced medication briefly in response to objections to the proposed settlement raised by members of the inmate class.  <u>Id.</u> at 407-08. In addressing these objections, the court expressed its confidence that the settlement agreement adequately addressed any concerns regarding forced medication because the agreement provided for the creation of special needs units, procedures whereby each prisoner's care would be decided upon by a treatment review committee including a comprehensive treatment plan, and increased prisoner/staff ratios.  <u>Id.</u> at 408.  However, the issue of whether the specific procedures for forcibly medicating an inmate comported with due process requirements was not before the court in <u>D.M.</u>.

     Here, Plaintiff only challenges the validity of the IMA Procedure and the FMP he has been subjected to for Risperdal as violative of due process.  Accordingly, any arguments by Defendants regarding a claim for deliberate indifference will not be addressed herein as that issue is not properly before the Court.

*(1) Standards Governing Involuntary Medication*

In <u>Washington v. Harper</u>, the Supreme Court specifically considered the circumstances under which a state could involuntarily administer psychotropic medication to prison inmates in accordance with the Due Process Clause of the Fourteenth Amendment.  410 U.S. at 213-214.  The Supreme Court outlined the substantive due process issue as follows:

> [t]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. ... [such that] the substantive issue is what factual circumstances must exist before the State may administer antipsychotic drugs to a prisoner against his will[?]

<u>Id.</u> at 220 (citations and internal quotations omitted).  The Supreme Court went on to explain that:

> [t]he procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance. ... [such that] the ... issue is whether the State's nonjudicial mechanisms used to determine the facts of a particular case are sufficient.

<u>Id.</u> at 220-21 (citations and internal quotations omitted).

The Supreme Court then highlighted several substantive and procedural components of the challenged policy in <u>Washington</u> as set forth below:

> First, if a psychiatrist determines that an inmate should be treated with antipsychotic drugs but the inmate does not consent, the inmate may be subjected to involuntary treatment with the drugs

33

only if he (1) suffers from a "mental disorder" and
(2) is "gravely disabled" or poses a "likelihood of
serious harm" to himself, others, or their
property.  Only a psychiatrist may order or approve
the medication.  Second, an inmate who refuses to
take the medication voluntarily is entitled to a
hearing before a special committee consisting of a
psychiatrist, a psychologist, and the Associate
Superintendent of the Center, none of whom may be,
at the time of the hearing, involved in the
inmate's treatment or diagnosis.  If the committee
determines by a majority vote that the inmate
suffers from a mental disorder and is gravely
disabled or dangerous, the inmate may be medicated
against his will, provided the psychiatrist is in
the majority.

Third, the inmate has certain procedural rights
before, during, and after the hearing.  He must be
given at least 24 hours' notice of the Center's
intent to convene an involuntary medication
hearing, during which time he may not be medicated.
In addition, he must receive notice of the
tentative diagnosis, the factual basis for the
diagnosis, and why the staff believes medication is
necessary.  At the hearing, the inmate has the
right to attend; to present evidence, including
witnesses; to cross-examine staff witnesses; and to
the assistance of a lay adviser who has not been
involved in his case and who understands the
psychiatric issues involved.  Minutes of the
hearing must be kept, and a copy provided to the
inmate.  The inmate has the right to appeal the
committee's decision to the Superintendent of the
Center within 24 hours, and the Superintendent must
decide the appeal within 24 hours after its
receipt.  The inmate may seek judicial review of a
committee decision in state court by means of a
personal restraint petition or extraordinary writ.

Fourth, after the initial hearing, involuntary
medication can continue only with periodic review.

Id. at 215-16 (footnote and citations omitted).

In assessing whether the policy at issue in Washington

comported with the requirements of substantive due process, the

Supreme Court first recognized that under both the challenged
policy and the Due Process Clause of the Fourteenth Amendment,
prison inmates "possess[] a significant liberty interest in
avoiding the unwanted administration of antipsychotic drugs[.]"
Id. at 221.  After setting forth the standard for determining the
constitutionality of a prison regulation, namely that a court
must "ask whether the regulation is 'reasonably related to
legitimate penological interests[,]'" id. at 223, the Supreme
Court found that the challenged policy was a rational means of
furthering the state's legitimate objectives.  Id. at 226.  These
legitimate objectives for involuntarily medicating inmates
include, for example: (1) "combating the danger posed by a person
to both himself and others ... in a prison environment, which,
'by definition,' is made up of persons with 'a demonstrated
proclivity for antisocial criminal, and often violent,
conduct[;]'" and (2) providing "prisoners with medical treatment
consistent not only with their own medical interests, but also
with the needs of the institution[,] ... [including] ensuring the
safety of prison staffs and administrative personnel, ... [and]
tak[ing] reasonable measures for the prisoners' own safety."  Id.
at 226 (citations omitted).

     The Supreme Court ultimately concluded that the challenged
policy was a rational means for meeting these objectives because
the policy was applied exclusively to "inmates who [were]

35

mentally ill and who, as a result of their illness, [were]
gravely disabled or represent[ed] a significant danger to
themselves or others[,]" and because "[t]he drugs [could] be
administered for no purpose other than treatment, and only under
the direction of a licensed psychiatrist." Id. Therefore, on
the issue of substantive due process, the Supreme Court held
that:

> given the requirements of the prison
> environment, the Due Process Clause permits
> the State to treat a prison inmate who has a
> serious mental illness with antipsychotic
> drugs against his will, if the inmate is
> dangerous to himself or others and the
> treatment is in the inmate's medical interest.

Id. at 227.

After addressing the substantive due process challenge, the
Supreme Court then addressed "what procedural protections are
necessary to ensure that the decision to medicate an inmate
against his will is neither arbitrary nor erroneous[.]" Id. at
228. In resolving this issue, the Supreme Court found that "the
administrative hearing procedures set by the [challenged policy]
... comport[ed] with procedural due process, and ... a judicial
hearing [is not required] as a prerequisite for the involuntary
treatment of prison inmates." Id. Although the Supreme Court
recognized that prison inmates have a substantial interest "in
avoiding the unwarranted administration of antipsychotic drugs"
and the potential side effects of these medications, the Court

36

found that an "inmate's interests are adequately protected, and perhaps better served, by allowing the decision to [involuntarily] medicate to be made by medical professionals rather than a judge."  Id. at 229-231.

In Washington, the Supreme Court specifically concluded that the "[a]dequate procedures exist[ed]" with respect to the challenged policy.  Id. at 233.  For example, the policy provided that the ultimate decisionmaker on the issue of involuntary medication was an independent administrative hearing committee which reviewed a medical treatment decision made by a medical professional where no member of the committee was involved with the inmate's treatment or diagnosis at that time.  Id. at 232-33.  In particular, the committee's review consisted to two "medical inquiries" regarding whether the inmate suffered from a mental disorder and whether, as a result of the disorder, he was dangerous to himself, others, or property.  Id. at 232.

Moreover, the policy required the hearing committee to regularly review the type and dosage of drugs and to make appropriate changes as needed.  Id. at 232-33.  Additional protections in the policy also included affording the inmate with notice of the committee's hearing, giving the inmate the right to be present for the hearing, allowing the inmate to proffer and cross-examine witnesses at the hearing, and providing the inmate with an independent lay adviser who understood the psychiatric

37

issues involved.  Id. at 235-36.  Upon review, the Supreme Court
held that the challenged policy was constitutional because it
provided the essential procedural protections required under the
Due Process Clause and served as "an accommodation between an
inmate's liberty interest in avoiding the forced administration
of antipsychotic drugs and the State's interests in providing
appropriate medical treatment to reduce the danger that an inmate
suffering from a serious mental disorder represents to himself or
others."  Id. at 236.

Four days prior to the Supreme Court's opinion in
Washington, the Third Circuit addressed the related question of
whether an inmate has a right to refuse medical treatment in
general.  White v. Napoleon, 897 F.2d 103, 112-13 (3d Cir. 1990).
Upon examination, the Third Circuit held that inmates have a
limited right to refuse treatment -- the scope of which is
"circumscribed by legitimate countervailing State interests" --
such that "a prison may compel a prisoner to accept treatment
when prison officials, in the exercise of professional judgment,
deem it necessary to carry out valid medical or penological
objectives."  Id. at 113.  Under this standard, the determination
to involuntarily medicate an inmate "will be presumed valid
unless it is shown to be such a substantial departure from
accepted professional judgment, practice or standards as to
demonstrate that the person responsible actually did not base the

38

decision on such judgment." Id.

(2) Provisions of the DOC's IMA Procedure at Issue

Here, the DOC's IMA Procedure provides that all inmates

under the control of the DOC:

> will have access to ... non-emergency involuntary
> psychotropic medication administration when
> clinically indicated by the treating psychiatrist
> that is in the best medical interest for a seriously
> mentally ill inmate, who, despite reasonable efforts
> by mental health providers to obtain voluntary
> compliance, refuses to accept such medication
> prescribed for him as part of an individualized
> treatment program.

(Ex. B. to Decl. of Kippie Pelzer, DOC 65.)

Although a mentally ill inmate may refuse psychotropic

medication when he presents no imminent danger to himself or

others, non-emergency medication may be prescribed involuntarily

when a psychiatrist determines that:

> a.  The inmate is incapable, without medication, of
>     participating in a treatment plan that will
>     provide a realistic opportunity of improving
>     his/her condition[; or]
> b.  There is a significant possibility that,
>     without medication, the patient will harm
>     himself, others or cause substantial property
>     damage before improvement of his condition is
>     realized. ...[; or]
> c.  The inmate is unable to care for himself ... so
>     that his ... health and/or safety are
>     endangered.

(Id.)

However, prior to considering the involuntary administration

of medication, the inmate's treating psychiatrist must make

"reasonable efforts ... to educate the inmate to accept

39

clinically indicated medication voluntarily" and such reasonable efforts must "have proven unsuccessful." (Id. at DOC 66.) The treating psychiatrist must document the reasonable efforts made to educate the inmate about his illness and symptoms, the reasons medication is recommended, and the risks of not implementing medication. (Id.) To the extent necessary, the treating psychiatrist may "enlist the assistance of other mental health staff, the social work staff, or others with whom the inmate has a relationship in efforts to achieve voluntary compliance with medication." (Id.)

Where a treating psychiatrist determines that involuntary administration of medication is indicated and reasonable efforts to educate the inmate and obtain voluntary compliance are unsuccessful, the treating psychiatrist prepares and submits an IMR recommending involuntary administration of medication. (Id.) In doing so, the treating psychiatrist must acknowledge that "the risks of psychiatric decompensation and related dangerousness out-weigh the known medical risks related to implementing involuntary medication administration[.]" (Id.)

### (3) The IMA Procedure, and Plaintiff's Treatment Thereunder, Comport with Due Process Requirements

In this case, Defendants assert and the Court agrees, that the IMA Procedure utilized by the New Jersey DOC satisfies both substantive and procedural due process requirements. Substantively, the IMA Procedure models the approved policy in

40

<u>Washington</u> because it only applies where a treating psychiatrist determines that psychotropic medication is clinically indicated and in the best medical interest of a seriously mentally ill inmate who presents a danger to himself or others.  <u>Compare</u> (Ex. B to Decl. of Kippie Pelzer, DOC 65), <u>with</u> <u>Washington</u>, 494 U.S. at 227 (holding that "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.")  Accordingly, the record demonstrates that the IMA Procedure is reasonably related to the state's legitimate interests in responding to the dangers posed by a mentally ill inmate, providing inmates with treatment in their medical interest, and ensuring the safety of prison staff, administrative personnel, and inmates.

The IMA Procedure also procedurally mirrors the approved policy in <u>Washington</u> and, as Defendants represent, provides inmates with all the essential protections that are necessary to comport with procedural due process.  For example, in <u>Washington</u>, the Supreme Court approved the challenged policy in part because ultimate decisionmaker on the issue of involuntary medication was an independent administrative hearing committee which reviewed a medical treatment decision made by a medical professional and no member of the committee was involved with the inmate's treatment

or diagnosis at that time.  494 U.S. at 232-33.  In this instance, the IMA Procedure sets up an almost identical independent administrative hearing committee which decides the issue of involuntary administration of medication. Specifically, the IMA Procedure requires that a Treatment Review Committee, consisting of a psychiatrist, a psychologist, and a designee of the institution's Administrator, convene within twenty-four hours of the receipt of the treating psychiatrist's IMR by the Administrator.  (Ex. B. to Decl. of Kippie Pelzer, DOC 67.)  The IMA Procedure further requires that no member of the TRC may be involved with an inmate's treatment or diagnosis at that time.  (Id.)

Moreover, much like the administrative hearing committee in Washington which reviewed two "medical inquiries" regarding whether the inmate suffered from a mental disorder and whether, as a result of the disorder, he was dangerous to himself, others, or property, 494 U.S. at 232, here, the TRC is similarly tasked with the "responsibility ... to consider the treating psychiatrist's recommendation to involuntarily medicate an inmate and to determine whether the recommendation meets the criteria to be in the inmate's medical interest."  (Ex. B. to Decl. of Kippie Pelzer, DOC 67.)  Although the TRC must review a variety of information contained in the IMR, the "determining factor" for finding that "involuntary medication administration is in the

42

best medical interest of the inmate" is based on whether the IMR outlines: (1) the gains expected as a result of involuntary medication; and (2) the treating psychiatrist's "stated belief that the possible gains for the inmate outweigh the risks of the medication and its administration involuntarily."  (Id. at DOC 69.)

Subsequent to the TRC's review of the IMR and any supporting documents, the TRC must then conduct a hearing to consider the treating psychiatrist's recommendation within five days.  (Id.) Importantly here, and as similarly provided by the approved policy in Washington, under the IMA Procedure, the inmate: (1) must receive written notice of the hearing at least twenty-four hours in advance outlining the inmate's rights during the hearing, (see id. at DOC 69-70); (2) is appointed a Staff Advisor to "assist the inmate during the proceedings[,]"[24] (see id. at DOC 64); (3) should "be offered an opportunity to be clinically informed [regarding the medication], to ask questions, and to state any cogent reasons for objecting[,]" (see id. at DOC 69); and (4) should be informed that he will have "an opportunity to voice any objections during the interview with the [TRC's] non-treating psychiatrist."  (Id.)  Compare to Washington, 494 U.S. at 235-36 (finding policy comported with procedural due process

---

24.  The inamte's Staff Advisor does "not have voting privileges [on the TRC]. ... [and] is generally a member of the NJDOC Social Services staff."  (Ex. B to Decl. of Kippie Pelzer, DOC 64.)

where it afforded inmates with notice of the committee hearing, gave inmates the right to be present for the hearing, allowed inmates to proffer and cross-examine witnesses at the hearing, and provided inmates with an independent lay adviser who understood the psychiatric issues involved).

Similarly to the policy in Washington, once the TRC renders its decision, the inmate must be given a copy of the decision by the Staff Advisor, and the inmate has twenty-four hours to appeal.[25]  (Ex. B to Decl. of Kippie Pelzer, DOC 70.)  However, even where the TRC votes in favor of medicating an inmate with psychotropic drugs against his will, the involuntary administration of medication cannot continue for an indefinite period of time.  Just as the approved policy in Washington required the hearing committee to regularly review the type and dosage of drugs and to make appropriate changes as needed, 494 U.S. at 232-33, the IMA Procedure incorporates similar procedural safeguards for inmates after the original decision for involuntary medication is made.

Specifically, upon the expiration of the initial twenty-four hour period after the TRC's decision and in the absence of any appeal, a finding by the TRC authorizing the involuntary administration of medication remains in effect for thirty (30)

─────────────

25.  To the extent an inmate wishes to appeal, any appeal may be "based solely upon the allegations that the [IMA Procedure] was not followed."  (Ex. B to Decl. of Kippie Pelzer, DOC 74.)

calendar days.  (Ex. B to Decl. of Kippie Pelzer, DOC 70.)
Thereafter, involuntary medication may only continue if, no less
than five business days before this thirty-day period expires,
the treating psychiatrist seeks to extend the involuntary
administration of medication for one hundred eighty (180) days by
submitting a new IMR.  (Id. at DOC 71.)  The TRC must convene
again to make a determination on whether to continue the
involuntary administration of medication for this additional time
period.  (Id.)  "This procedure may continue in accordance with
NJDOC policy at 180-day intervals as long as the medication is
clinically indicated and the mental health staff is unable,
despite reasonable efforts, to obtain the inmate's voluntary
compliance with medication."  (Id.)

     Furthermore, the IMA Procedure provides additional
protections for inmates, which, as Defendants point out, require:
(1) a treating physician to use reasonable efforts to obtain an
inmate's voluntary compliance for taking prescribed psychotropic
medication, and to complete an IMR only where an inmate refuses;
and (2) the TRC to review an inmate's diagnosis, treatment plan,
medications, behaviors, psychiatric exams, the efforts taken to
obtain voluntary compliance, and the gains versus possible side
effects of the medication.  (Id. at DOC 66-69.)  Thus, having
reviewed the numerous procedural protections set forth in the IMA
Procedure and the substantial degree to which these protections

mirror those considered adequate by the Supreme Court in
Washington, the Court finds that the IMA Procedure provides
inmates with the essential procedural protections required under
the Due Process Clause.

This finding by the Court is consistent with the findings of
other courts in this District which have reviewed the DOC's IMA
Procedure at issue in this case and found that it comports with
due process requirements.  See, e.g., Gooden v. Ricci, No. 08-
5321, 2011 WL 689619, at *8-11 (D.N.J. Feb. 17, 2011) (granting
summary judgment in favor of members of a TRC and a treating
psychiatrist where, after a detailed review and comparison, the
court concluded that "the NJDOC Mental Health Services Internal
Management Procedure for Non-Emergency Involuntary Medication
Administration mirrors, in all relevant respects, the policy
upheld in Washington v. Harper."); Aruanno v. Glazmin, No. 03-
3696, 2007 WL 1221113, at *6-8 (D.N.J. Apr. 20, 2007) (granting
summary judgment to psychiatrists and members of TRC involved in
the involuntary medication of plaintiff on substantive due
process grounds consistent with standards in Washington and
White), aff'd, 316 F. App'x 194, 195-96 (3d Cir. 2009).

With respect to Plaintiff's claim that Defendants are
involuntarily medicating Plaintiff without due process of law,
(see Pl.'s Compl. 8), Defendants are entitled to summary
judgment.  Viewing the underlying facts, and drawing all

reasonable inferences in favor of Plaintiff, the undisputed
evidence in the record demonstrates not only that the IMA
Procedure comports with both substantive and procedural due
process requirements, but also that the decision to involuntarily
medicate Plaintiff resulted only after the IMA Procedure was
followed in great detail.  There is no dispute that Plaintiff was
diagnosed with a serious mental illness, initially —— an
unspecified psychotic disorder, and ultimately —- paranoid
schizophrenia.

It is also undisputed that Plaintiff's diagnoses were based
on a series of well-documented delusions, paranoid beliefs, and
behaviors exhibited by Plaintiff, including, *inter alia*, his
refusal to eat for multiple days based on a belief his food was
poisoned with cyanide, his inability to sleep for multiple days,
representations by Plaintiff that he heard voices, observations
of Plaintiff wearing a styrofoam cup on his forehead to protect
himself from laser beams he believed were burning his brain, and
Plaintiff's belief he had been pardoned for his crime by both the
Governor and the President.[26]  Moreover, at least four
psychiatrists employed by the New Jersey DOC, other than

---

26.  In opposition to the motion for summary judgment, Plaintiff
attempts to explain away the behaviors and delusions documented
by mental health personnel employed by DOC, but Plaintiff's mere
allegations, general denials, and vague statements regarding his
symptoms and behaviors are insufficient to overcome the medical
evidence presented by Defendants as to Plaintiff's documented
mental health history.

Defendant Bush, evaluated Plaintiff at various points during his treatment and observed similar symptoms supporting the diagnosis of Plaintiff's psychotic disorder.

The record also demonstrates that each of the four recommendations for a FMP was made by a licensed psychiatrist[27] who treated and evaluated Plaintiff, and that these recommendations were made only after the treating psychiatrists were unsuccessful in obtaining Plaintiff's voluntary compliance with medication.  Moreover, Defendants submitted substantial

_____

27.  These individuals included Drs. Maljian, Tamburello, and Bush.  To the extent Plaintiff argues that Defendant Bush is "not licensed as a psychiatrist by the state of New Jersey Board of Psychological Examiners[,]" Plaintiff's argument fails as presented here.

In support of his contention that Dr. Bush is not a licensed psychiatrist, Plaintiff points to the July 23, 2010 certification of J. Michael Walker, Executive Director of the State Board of Psychological Examiners, which Plaintiff received in response to a subpoena for documents.  (Pl.'s Opp'n 2) (citing Certification of J. Michael Walker [Doc. No. 35] 7).  Mr. Walker's certification states in pertinent part that "a review of the files does not contain any documentation regard[ing] David L. Bush, M.D., and that he is not a licensee of the Board." (Certification of J. Michael Walker [Doc. No. 35] 7, ¶2.)

While Plaintiff's attempt to support this claim is noteworthy, it appears that Plaintiff has misunderstood Defendant Bush to be a psychologist, rather than a psychiatrist with a medical degree.  However, the Court notes that the New Jersey State Board of Psychological Examiners "licenses and regulates psychologists in New Jersey[,]" as opposed to psychiatrists. (See State Board of Psychological Examiners, Division of Consumer Affairs, http://www.njconsumeraffairs.gov/psy/ (last visited Apr. 25, 2012).  While it may be true that the State Board of Psychological Examiners lacks documentation supporting the licensure of Defendant Bush as a psychologist, the Court cannot afford any weight to Mr. Walker's Certification given the fact that the Board licenses only psychologists and not psychiatrists, of which Defendant Bush is the latter.

documentary evidence to demonstrate that in each of the four
instances, the treating psychiatrists properly completed and
submitted IMRs which outlined in sufficient detail: (1)
Plaintiff's symptoms and psychiatric history; (2) the
psychiatrists' resultant findings that involuntary medication was
in Plaintiff's medical interests because he presented a danger to
himself or others, was unable to care for himself, or was
incapable of participating in a treatment plan that would improve
his condition; and (3) the psychiatrists' beliefs that the
benefits of involuntary medication outweighed the possible side
effects.

        Furthermore, the record clearly demonstrates that four
separate TRCs were convened regarding Plaintiff's treatment and
FMPs, and that each TRC independently reviewed the documentary
evidence and voted in favor of adopting the treating
psychiatrist's recommendation for involuntarily medicating
Plaintiff, finding that he presented a substantial risk of harm
to himself, would be unable to care for himself and would be
incapable of participating in his treatment plan without
medication.  The undisputed evidence further establishes that
Plaintiff received notice of each respective TRC hearing, that
Plaintiff attended three of the four TRC hearings, chose not to
appeal any of the TRC's findings, and was appointed a Staff
Advisor in each instance.  Moreover, Plaintiff's involuntary

medication was periodically reviewed in accordance with the IMA Procedure.

Here, in the absence of any evidence to contradict the medical documentation demonstrating that the IMA Procedure was carefully followed with respect to Plaintiff's treatment, Defendants are entitled to summary judgment on Plaintiff's claims that he was involuntarily medicated without due process.  While Plaintiff certainly possesses a limited right to refuse medical treatment, see White, 897 F.2d at 113, in this case, the determination to involuntarily medicate Plaintiff must be presumed valid because there is no evidence to suggest that Plaintiff's treatment and involuntary medication constituted a substantial departure from accepted professional judgment, practice or standards, and this treatment was in his medical interest.

**V.   CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment [Doc. No. 54] is granted in its entirety, and Plaintiff's complaint is dismissed with prejudice.  An Order consistent with this Opinion will be entered.


Dated: June 14, 2012             /s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.